1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANIEL FRAZER, | Case No. 1:20-cv-01092-DAD-SAB-HC |
| Petitioner, | FINDINGS AND RECOMMENDATION RECOMMENDING DENIAL OF PETITION FOR WRIT OF HABEAS CORPUS |
| v. | |
| NEIL MCDOWELL, | |
| Respondent. | |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

## I.

## BACKGROUND

On July 31, 2015, Petitioner was convicted after a jury trial in the Merced County Superior Court of two counts of first-degree robbery. (8 CT[1] 1929, 1931). Petitioner was sentenced to an imprisonment term of twenty-five years to life. (9 CT 2297). On January 31, 2019, the California Court of Appeal, Fifth Appellate District affirmed the judgment. People v. Frazer, No. F073793, 2019 WL 396856 (Cal. Ct. App. Jan. 31, 2019), as modified on denial of reh'g (Feb. 25, 2019). On February 25, 2019, the California Court of Appeal, Fifth Appellate District denied Petitioner's petition for rehearing. (LD[2] 24). On May 15, 2019, the California

---

[1] "CT" refers to the Clerk's Transcript on Appeal lodged by Respondent on October 30, 2020. (ECF Nos. 13–15).
[2] "LD" refers to the documents lodged by Respondent on October 30, 2020. (ECF Nos. 13–15).

1  Supreme Court denied Petitioner's petition for review. (LDs 27, 28). All seven of Petitioner's

2  state habeas petitions were denied. (LDs 31–42).

3        On August 6, 2020, Petitioner filed the instant federal petition for writ of habeas corpus.

4  (ECF No. 1). In the petition, Petitioner asserts that he is entitled to habeas relief on the following

5  grounds: (1) presentation of false evidence by the prosecution; (2) violation of the Equal

6  Protection Clause; (3) violation of Petitioner's right to a speedy trial; and (4) violation of the

7  Confrontation Clause. (ECF No. 1 at 4–5).[3] Respondent filed an answer, and Petitioner filed a

8  traverse. (ECF Nos. 12, 16).

9  **II.**

10  **STATEMENT OF FACTS[4]**

11  On February 15, 2011, [Frazer] was charged by complaint with two counts of
robbery (Pen. Code, § 211[5]) and three enhancements for prior convictions

12  (§§ 667, subds. (b)-(i), 1170.12, 668) and was arraigned on the complaint on May
13, 2013. At his arraignment, [Frazer] waived his right to counsel and exercised

13  his right to represent himself pursuant to *Faretta v. California* (1975) 422 U.S.
806 (*Faretta*). Following a preliminary hearing, [Frazer] was held to answer to the

14  charges on November 8, 2013. A first amended information was filed on January
29, 2015, charging [Frazer] with two counts of robbery (§ 211) and four

15  enhancements for prior convictions (§§ 667, subds. (b)-(i), 1170.12, 668). Trial
commenced on July 15, 2015.

16

17  **Prosecution Case**

18  The charges alleged in the information arose out of a bank robbery that occurred
on November 6, 2009, against two tellers working at the bank. The primary issue

19  in the case was identity. The robbery occurred in Livingston, California, at
approximately 10:21 a.m. The robber entered the bank with a lunch box-sized

20  cooler. He wore a mask with cutouts for his eyes and nose, eye glasses, and latex
gloves. He approached a teller, J.S., and demanded "100s and 50s." She gave him

21  the money, and the robber went to the window of the other teller, S.S., and
demanded "100s and 50s." S.S., too, handed over money. The robber did not

22  display a weapon or use a note.

23  S.S. testified the robber had a similar skin tone and build to [Frazer]. J.S. testified
the complexion of the robber was the same as [Frazer]'s and that they had the

24  same eyes.

25  An expert witness in cellular technology testified he had reviewed cell phone
records related to [Frazer]'s phone and that at 9:58 a.m. on the day of the robbery,

26  [Frazer]'s cell phone connected to the cell site that covered the same location as

27  _____
[3] Page numbers refer to the ECF page numbers stamped at the top of the page.
[4] The Court relies on the California Court of Appeal's February 25, 2019 opinion for this summary of the facts of
the crime. See Vasquez v. Kirkland, 572 F.3d 1029, 1031 n.1 (9th Cir. 2009).

28  [5] All further statutory code references are to the Penal Code unless otherwise noted.

the bank where the robbery occurred, raising an inference he was in the vicinity of the robbery when it occurred.

The prosecution offered evidence of three other robberies that took place in San Joaquin County on September 11, 2009, October 6, 2009, and December 4, 2009, to prove identity pursuant to Evidence Code section 1101, subdivision (b). [Frazer] was apprehended after the December 4, 2009, robbery at the end of a high-speed chase. At the time, he denied the September and October robberies, though DNA evidence later tied him to those robberies. He pled guilty to the December 4, 2009, robbery and testified at trial he committed all three.

The September 11, 2009, robbery occurred at approximately 11:30 a.m. [Frazer] wore a mask with cutouts for his eyes and surgical gloves. He yelled at the tellers that he wanted "100s and 50s." He did not use a gun or a note during the robbery.

The October 6, 2009, robbery occurred at the same bank as the September robbery at approximately 10:45 a.m. [Frazer] wore a mask with cutouts for his eyes and surgical gloves. He approached two tellers and demanded 50's and 100's from each.

The December 4, 2009, robbery took place in the same town as the first two robberies at a different bank at approximately 10:04 a.m. [Frazer] approached the teller window and yelled that he wanted "100s and 50s." He did not use a gun or a note. He was carrying a spray bottle. After he was arrested, he told law enforcement he never uses weapons because he does not want to hurt anyone and "[y]ou don't need a gun to rob a bank." He said he typically carries something in his hand to give the appearance he has a reason to be walking around the bank, and this is why he carried the spray bottle.

**Defense Case**

A detective testified that J.S. was unable to identify [Frazer] in a photo lineup. [Frazer] also testified. He denied committing the charged November robbery and admitted to committing the three uncharged robberies. [Frazer] also testified he never used a gun or note and wore his glasses during all his robberies.

[Frazer] was found guilty of both counts of robbery. A bifurcated bench trial was held on October 16, 2015, on [Frazer]'s prior convictions. The prosecution dismissed two of the alleged prior convictions, and the trial court found the remaining two allegations true. [Frazer] was sentenced to a term of imprisonment of 25 years to life on count 1 and a concurrent term of 25 years to life on count 2.

Frazer, 2019 WL 396856, at *1–2 (footnote in original).

# III.

# STANDARD OF REVIEW

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed

1 by the U.S. Constitution. The challenged conviction arises out of the Fresno County Superior

2 Court, which is located within the Eastern District of California. 28 U.S.C. § 2241(d).

3        On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act

4 of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its

5 enactment. Lindh v. Murphy, 521 U.S. 320 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th

6 Cir. 1997) (en banc). The instant petition was filed after the enactment of AEDPA and is

7 therefore governed by its provisions.

8        Under AEDPA, relitigation of any claim adjudicated on the merits in state court is barred

9 unless a petitioner can show that the state court's adjudication of his claim:

10 
11       (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

12 
13       (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

14 28 U.S.C. § 2254(d); Harrington v. Richter, 562 U.S. 86, 97–98 (2011); Lockyer v. Andrade, 538

15 U.S. 63, 70–71 (2003); Williams, 529 U.S. at 413.

16        As a threshold matter, this Court must "first decide what constitutes 'clearly established

17 Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71

18 (quoting 28 U.S.C. § 2254(d)(1)). In ascertaining what is "clearly established Federal law," this

19 Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as

20 of the time of the relevant state-court decision." Williams, 529 U.S. at 412. "In other words,

21 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles

22 set forth by the Supreme Court at the time the state court renders its decision." Id. In addition,

23 the Supreme Court decision must "'squarely address [] the issue in th[e] case' or establish a legal

24 principle that 'clearly extend[s]' to a new context to the extent required by the Supreme Court in

25 . . . recent decisions"; otherwise, there is no clearly established Federal law for purposes of

26 review under AEDPA. Moses v. Payne, 555 F.3d 742, 754 (9th Cir. 2009) (quoting Wright v.

27 Van Patten, 552 U.S. 120, 125 (2008)); Panetti v. Quarterman, 551 U.S. 930 (2007); Carey v.

28 Musladin, 549 U.S. 70 (2006). If no clearly established Federal law exists, the inquiry is at an

1   end and the Court must defer to the state court's decision. Musladin, 549 U.S. 70; Wright, 552

2   U.S. at 126; Moses, 555 F.3d at 760.

3          If the Court determines there is governing clearly established Federal law, the Court must

4   then consider whether the state court's decision was "contrary to, or involved an unreasonable

5   application of, [the] clearly established Federal law." Lockyer, 538 U.S. at 72 (quoting 28 U.S.C.

6   § 2254(d)(1)). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the

7   state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question

8   of law or if the state court decides a case differently than [the] Court has on a set of materially

9   indistinguishable facts." Williams, 529 U.S. at 412–13; see also Lockyer, 538 U.S. at 72. "The

10  word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite in character

11  or nature,' or 'mutually opposed.'" Williams, 529 U.S. at 405 (quoting Webster's Third New

12  International Dictionary 495 (1976)). "A state-court decision will certainly be contrary to

13  [Supreme Court] clearly established precedent if the state court applies a rule that contradicts the

14  governing law set forth in [Supreme Court] cases." Id. If the state court decision is "contrary to"

15  clearly established Supreme Court precedent, the state decision is reviewed under the pre-

16  AEDPA de novo standard. Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008) (en banc).

17         "Under the 'reasonable application clause,' a federal habeas court may grant the writ if

18  the state court identifies the correct governing legal principle from [the] Court's decisions but

19  unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413.

20  "[A] federal court may not issue the writ simply because the court concludes in its independent

21  judgment that the relevant state court decision applied clearly established federal law erroneously

22  or incorrectly. Rather, that application must also be unreasonable." Id. at 411; see also Lockyer,

23  538 U.S. at 75–76. The writ may issue only "where there is no possibility fair minded jurists

24  could disagree that the state court's decision conflicts with [the Supreme Court's] precedents."

25  Richter, 562 U.S. at 102. In other words, so long as fair minded jurists could disagree on the

26  correctness of the state court's decision, the decision cannot be considered unreasonable. Id. If

27  the Court determines that the state court decision is objectively unreasonable, and the error is not

28  ///

1    structural, habeas relief is nonetheless unavailable unless the error had a substantial and injurious
2    effect on the verdict. Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).

3         The Court looks to the last reasoned state court decision as the basis for the state court
4    judgment. Wilson v. Sellers, 138 S. Ct. 1188, 1192 (2018); Stanley v. Cullen, 633 F.3d 852, 859
5    (9th Cir. 2011). If the last reasoned state court decision adopts or substantially incorporates the
6    reasoning from a previous state court decision, this Court may consider both decisions to
7    ascertain the reasoning of the last decision. Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir.
8    2007) (en banc). "When a federal claim has been presented to a state court and the state court has
9    denied relief, it may be presumed that the state court adjudicated the claim on the merits in the
10   absence of any indication or state-law procedural principles to the contrary." Richter, 562 U.S. at
11   99. This presumption may be overcome by a showing "there is reason to think some other
12   explanation for the state court's decision is more likely." Id. at 99–100 (citing Ylst v.
13   Nunnemaker, 501 U.S. 797, 803 (1991)).

14        Where the state courts reach a decision on the merits but there is no reasoned decision, a
15   federal habeas court independently reviews the record to determine whether habeas corpus relief
16   is available under § 2254(d). Stanley, 633 F.3d at 860; Himes v. Thompson, 336 F.3d 848, 853
17   (9th Cir. 2003). "Independent review of the record is not de novo review of the constitutional
18   issue, but rather, the only method by which we can determine whether a silent state court
19   decision is objectively unreasonable." Himes, 336 F.3d at 853. While the federal court cannot
20   analyze just what the state court did when it issued a summary denial, the federal court must
21   review the state court record to determine whether there was any "reasonable basis for the state
22   court to deny relief." Richter, 562 U.S. at 98. This Court "must determine what arguments or
23   theories . . . could have supported, the state court's decision; and then it must ask whether it is
24   possible fairminded jurists could disagree that those arguments or theories are inconsistent with
25   the holding in a prior decision of [the Supreme] Court." Id. at 102.

26   ///
27   ///
28   ///

1

# IV.

2

# REVIEW OF CLAIMS

3

**A.  Procedural Default**

4      Respondent contends that all four of Petitioner's claims are procedurally defaulted

5  because the California Supreme Court denied each of the claims as barred by state procedural

6  rules and alternatively rejected them on the merits. (ECF No. 12 at 18–19). A federal court will

7  not review a petitioner's claims if the state court has denied relief on those claims pursuant to a

8  state law procedural ground that is independent of federal law and adequate to support the

9  judgment. <u>Coleman v. Thompson</u>, 501 U.S. 722, 729–30 (1991). This doctrine of procedural

10  default is based on the concerns of comity and federalism. <u>Id.</u> at 730–32. However, there are

11  limitations as to when a federal court should invoke procedural default and refuse to review a

12  claim because a petitioner violated a state's procedural rules. Procedural default can only block a

13  claim in federal court if the state court "clearly and expressly states that its judgment rests on a

14  state procedural bar." <u>Harris v. Reed</u>, 489 U.S. 255, 263 (1989). In determining whether a state

15  procedural ruling bars federal review, the Court looks to the "last reasoned opinion on the

16  claim." <u>Ylst</u>, 501 U.S. at 804. <u>See id.</u> at 802 (defining an unexplained order as one "whose text or

17  accompanying opinion does not disclose the reason for the judgment").

18      All four of the claims raised in the instant federal petition were presented in a state

19  habeas petition filed in the California Supreme Court. (LD 41). In denying the petition, the

20  California Supreme Court stated:

21          The petition for writ of habeas corpus is denied. Individual claims are denied, *as*
            *applicable*. (See People v. Duvall (1995) 9 Cal.4th 464, 474 [a petition for writ of
22          habeas corpus must include copies of reasonably available documentary
            evidence]; In re Waltreus (1965) 62 Cal.2d 218, 225 [courts will not entertain
23          habeas corpus claims that were rejected on appeal]; In re Lessard (1965) 62
            Cal.2d 497, 503 [courts will not entertain habeas corpus claims that raise Fourth
24          Amendment violations]; In re Dixon (1953) 41 Cal.2d 756, 759 [courts will not
            entertain habeas corpus claims that could have been, but were not, raised on
25          appeal]; In re Swain (1949) 34 Cal.2d 300, 304 [a petition for writ of habeas
            corpus must allege sufficient facts with particularity].)
26

27  (LD 42 (emphasis added)).

28  ///

7

"[A] procedural default based on an ambiguous order that does not clearly rest on independent and adequate state grounds is not sufficient to preclude federal collateral review." Valerio v. Crawford, 306 F.3d 742, 774 (9th Cir. 2002) (en banc) (internal quotation marks omitted) (quoting Morales v. Calderon, 85 F.3d 1387, 1392 (9th Cir.1996)). Where a state court denies a habeas petition containing multiple claims, does not "specify which claims were barred for which reasons," Valerio, 306 F.3d at 775, and "affords no basis for choosing between a state law ground that would bar federal review, and one that would not, that decision cannot bar federal review," Koerner v. Grigas, 328 F.3d 1039, 1052 (9th Cir. 2003). See id. ("Under some circumstances, a federal court will be able to resolve an ambiguous order. For example, if the order affirms a previous lower court order that relies on the same grounds and specifies which grounds are applicable to which claims, there is no reason to assume that the appellate court applied different grounds to different claims.").

Here, the California Supreme Court's denial did not "specify which claims were barred for which reasons," Valerio, 306 F.3d at 775, and only noted that Petitioner's claims were denied "as applicable" with citation to multiple cases with parentheticals describing various procedural bars. (LD 42). In the answer, Respondent reviews the state court record to make educated conjectures as to which procedural bars the California Supreme Court relied on to deny each individual claim. However, the Ninth Circuit has rejected the suggestion "that such an unresolvable ambiguity exists only where, after reviewing the record, the federal court cannot guess at which grounds might be applicable to which claims," finding that such a "formulation is overstated." Koerner, 328 F.3d at 1052.  See id. at 1056 (Beezer, J., dissenting) ("If a state court opinion is ambiguous on its face, [the Koerner majority] opinion makes it impossible to find a procedural default . . . ."). The Ninth Circuit recognized that "where a state supreme court order expressly relies on different grounds than the lower court decision that it affirms, yet fails to explain which ground applies to which claim . . . federal courts generally will not be able to resolve the resulting ambiguity." Id. at 1052. Similarly, in the instant case, the California Supreme Court expressly relied on different grounds than the lower court decisions and failed to explain which ground applies to which claim. See Calderon v. U.S. Dist. Court (Bean), 96 F.3d

1  1126, 1131 (9th Cir. 1996) (district court properly declined to dismiss petition on procedural
2  default grounds because ambiguous state-court order did not specify which claims the court
3  rejected pursuant to Waltreus and which it rejected pursuant to Dixon).

4       Accordingly, the Court will proceed to the merits of Petitioner's claims. "Because the
5  state court ruled on procedural grounds without addressing the merits of [the] claim[s], see 28
6  U.S.C. § 2254(d), our review is de novo, see Chaker v. Crogan, 428 F.3d 1215, 1221 (9th Cir.
7  2005)." Bergna v. Benedetti, 721 F. App'x 729, 730 (9th Cir. 2018).

8       **B.  False Evidence**

9       In his first ground for relief, Petitioner asserts that the prosecution presented false
10  evidence, in violation of the Fourteenth Amendment. Specifically, Petitioner alleges that the
11  prosecution presented: (1) false testimony at the preliminary hearing regarding the presence of a
12  gray beanie at Petitioner's residence that linked him to the robbery; and (2) a false affidavit at
13  trial regarding Petitioner's cell phone records. (ECF No. 1 at 4).

14       1.  Legal Standard

15       "The knowing use of false evidence by the state, or the failure to correct false evidence,
16  may violate due process." Towery v. Schriro, 641 F.3d 300, 308 (9th Cir. 2010) (citing Napue v.
17  Illinois, 360 U.S. 264, 269 (1959)). "To establish a Napue claim, a petitioner must show that '(1)
18  the testimony (or evidence) was actually false, (2) the prosecution knew or should have known
19  that the testimony was actually false, and (3) . . . the false testimony was material.'" Towery, 641
20  F.3d at 308 (quoting United States v. Zuno–Arce, 339 F.3d 886, 889 (9th Cir. 2003)). In
21  assessing materiality, the Court must determine whether "there is 'any reasonable likelihood that
22  the false testimony could have affected the judgment of the jury.'" Soto v. Ryan, 760 F.3d 947,
23  958 (9th Cir. 2014) (quoting Hayes v. Brown, 399 F.3d 972, 978 (9th Cir. 2005)).[6] A court need
24  not review all three Napue prongs if a petitioner's argument fails at any one of the prongs. See
25  Panah v. Chappell, 935 F.3d 657, 664 (9th Cir. 2019); Towery, 641 F.3d at 308.

26  

27  [6] "There is nothing in Napue, its predecessors, or its progeny, to suggest that the Constitution protects defendants
   only against the knowing use of perjured testimony. Due process protects defendants against the knowing use of any
   false evidence by the State, whether it be by document, testimony, or any other form of admissible evidence."
28  Hayes, 399 F.3d at 981.

1        2.   <u>Testimony Regarding Gray Beanie</u>

2            **a.  Relevant Factual Background**

3        At the preliminary hearing, Detective John Ramirez of the Livingston Police Department

4    testified that he spoke with a witness, Marie Snell, who was present during the Livingston

5    robbery. (2 CT 451–52). Ramirez testified that Snell told him that the culprit was a "black male,

6    tall, wearing blue overalls, with a green beanie on his head demanding money." (2 CT 453).

7    Ramirez later testified that Snell told him the robber wore a gray beanie. (2 CT 467). Ramirez

8    also testified that he spoke with Detective Sweeten of the Ripon Police Department who told

9    Ramirez that a gray beanie was among the items discovered when the Ripon Police Department

10   executed a search warrant. Ramirez could not recall if the search was of Petitioner's property. (2

11   CT 467–68).

12       At the conclusion of the preliminary hearing, Petitioner was held to answer on the charge

13   of robbery. (3 CT 590–96). Petitioner later moved to dismiss the case against him based on

14   Detective Ramirez's inaccurate testimony that a gray beanie had been found during the search of

15   Petitioner's property. (2 Aug. CT[7] 4–8). Although both defense counsel and the prosecution

16   agreed that "no beanie was recovered during execution of a search warrant of defendant's

17   property," the trial court denied the motion to dismiss because "[u]pon reviewing the evidence

18   and disregarding Ramirez's testimony about the gray beanie, there was sufficient evidence to

19   support a holding order." (2 Aug. CT 13).

20       At trial, Detective Sweeten testified that he was not involved in the search of Petitioner's

21   residence and did not tell Detective Ramirez that a gray beanie had been discovered during the

22   search. (2 RT[8] 328–29; 3 RT 589–90). Sweeten testified that Ramirez would have been

23   inaccurate if Ramirez testified at the preliminary hearing that Sweeten told Ramirez that a gray

24   beanie was found during the search. (2 RT 330).

25       At trial, Officer Kenneth Husmen, who executed the search warrant, testified that a gray

26   beanie was not found during the search of Petitioner's residence. (3 RT 541–42). Detective

---

27   [7] "Aug. CT" refers to the Augmented Clerk's Transcript on Appeal lodged by Respondent on October 30, 2020.
     (ECF No. 13–15).

28   [8] "RT" refers to the Reporter's Transcript on Appeal lodged by Respondent on October 30, 2020. (ECF No. 13–15).

1  Sharon Johnson, who participated in the search, reviewed her report and testified that it would be
2  inaccurate if someone indicated that a gray beanie was found during the search. (2 RT 262–63).
3  At trial, Detective Ramirez acknowledged that he testified at the preliminary hearing that
4  Detective Sweeten had told him that a gray beanie was found during the search. (4 RT 685–86).

5          At trial, Sergeant Timothy Bailey testified that he was in a patrol vehicle and pursued
6  Petitioner's fleeing vehicle. Petitioner lost control of his vehicle and crashed. (1 RT 161–67).
7  Bailey testified that he discovered a "black knit stocking type beanie hat" at the scene. (1 RT
8  170). Bailey also logged into evidence "one large grey ski mask slash ski mask with eye holes."
9  (2 RT 218).

10                  **b.  Analysis**

11         As made evident by the proceedings on Petitioner's motion to dismiss and the testimony
12  presented at trial, Detective Ramirez's testimony at the preliminary hearing regarding a gray
13  beanie was incorrect. However, errors at a preliminary hearing do not support federal habeas
14  relief because such errors do not affect the constitutionality of the conviction but rather affect the
15  validity of the probable cause determination, which is not a constitutional prerequisite to a
16  charging decision. Gerstein v. Pugh, 420 U.S. 103, 125 n.26 (1975). It is an "established rule that
17  illegal arrest or detention does not void a subsequent conviction." Id. at 119 (citing Frisbie v.
18  Collins, 342 U.S. 519 (1952); Ker v. Illinois, 119 U.S. 436 (1886)). Additionally, "[i]t is well
19  settled that deprivations of constitutional rights that occur before trial are no bar to conviction
20  unless there has been an impact upon the trial itself. A conviction after trial . . . 'represents a
21  break in the chain of events which has preceded it in the criminal process.'" Rose v. Mitchell,
22  443 U.S. 545, 576 (1979) (Stewart, J., concurring) (footnote omitted) (quoting Tollett v.
23  Henderson, 411 U.S. 258, 267 (1973)).

24         Here, Petitioner fails to establish that Detective Ramirez's inaccurate testimony at the
25  preliminary hearing had an impact on the trial itself. Although Petitioner called Detective
26  Ramirez as a witness at trial and Ramirez acknowledged that he testified at the preliminary
27  hearing that Detective Sweeten had told him that a gray beanie was found during the search, the
28  testimony of multiple other relevant witnesses at trial refuted Detective Ramirez's incorrect

preliminary hearing testimony. In fact, Detective Sweeten explicitly testified that Ramirez would have been inaccurate if Ramirez testified at the preliminary hearing that Sweeten told Ramirez that a gray beanie was found during the search. (2 RT 330).

Based on the foregoing, Petitioner has not established that there is "any reasonable likelihood that the false testimony could have affected the judgment of the jury." Hayes, 399 F.3d at 978. Accordingly, Petitioner is not entitled to habeas relief on the ground that the prosecution knowingly presented false testimony at the preliminary hearing regarding a gray beanie.

### 3.  Affidavit Regarding Cell Phone Records

#### a.  Relevant Factual Background[9]

On July 22, 2015, [Frazer]'s advisory counsel filed a written objection to the admission of cell phone records. Attached to it were several documents that appeared to indicate the prosecutor had attempted to obtain [Frazer]'s authenticated cell phone records but was informed by AT&T the records had been purged by Cricket:

- An invoice dated March 2, 2010, issued by Cricket to DOJ/FBI – Modesto/Stockton for $55 for subscriber information and call history for [Frazer]'s phone number.

- A subpoena duces tecum dated May 14, 2015, issued by the prosecution to Cricket for [Frazer]'s call detail records.

- AT&T's response to the May 14, 2015, subpoena duces tecum, which indicated "usage records for this particular network are only stored for a rolling six months," and because the request did not fall within the time frame for which records are stored, "no usage records are available for us to produce."

- A fax cover sheet from the prosecutor to AT&T, dated May 27, 2015, which states:

  "This request is URGENT (because we are coming up for Jury Trial).

  "Please provide the records that are requested in the attached Subpoena Duces Tecum. The address to mail the records and declaration is the Merced County Superior Court. The address is located on the subpoena.

  "Attached are the records we have received from Cricket but we need CERTIFIED Copies with a filled out Declaration of Custodian of Records (which is attached).

---

[9] The Court relies on the California Court of Appeal's February 25, 2019 opinion for this summary of the relevant facts of the affidavit regarding Petitioner's cell phone records. See Vasquez, 572 F.3d at 1031 n.1.

"It is ok to discuss any matters related to this request with either Jim Cook or Chris Cook."

Attached to the fax cover sheet was a subpoena duces tecum dated May 27, 2015, and a blank form declaration of custodian of records.

- An email sent from another employee from the prosecutor's office to AT&T dated May 27, 2015, with the same language as the fax. Again, no documents purported to be attached to the email were attached to the objection.

- AT&T's response to the prosecutor's May 27, 2015, request stated the same language as the first response, indicating no usage records were available to produce because the request did not fall within six months of the period for which the records were requested.

- An unsigned document purportedly authored by James Finklea, dated June 6, 2015. The document states James Finklea is a compliance security analyst and serves as the custodian of records for AT&T. It states "[a]fter a thorough search of the documents relied on in the course of my duties ..., I was unable to find any information responsive to your request regarding [[Frazer]'s phone number.]"

- An affidavit signed by Dana Morgan-Williams dated June 17, 2015. She identified herself as a legal compliance analyst and custodian of records. The affidavit states: "Attached to this Affidavit are true and correct copies of subscriber information and/or call detail issued by AT&T for the following accounts: [¶] [[Frazer]'s phone number]. [¶] The attached copies of billing records are maintained by AT&T in the ordinary course of business. I maintain and routinely rely on these documents in the course of my duties as Custodian of Records and Legal Compliance Analyst." In one instance, the document states James Finklea, not Dana Morgan-Williams, was sworn by the notary. It is not clear what documents, if any, were attached to this affidavit.

- A Cricket subpoena compliance document dated July 21, 2015,[10] addressed to DOJ/FBI – Modesto/Stockton, which states: "The call detail records information you requested is not available for the time frame designated. Non-billed call switch data is purged at approximately six months." There is no telephone number listed on this document, but one of the reference numbers on this document matches one on the Cricket invoice dated March 2, 2010.

The objection was based on the ground raised in this appeal—that the records could not be properly authenticated because they had been purged by Cricket years earlier and were not in possession of AT&T. The court held a hearing pursuant to Evidence Code section 402 the same day, July 22, 2015, in response to [Frazer]'s objection. The prosecution's wireless expert testified.

---

[10] [Frazer]'s points and authorities in support of his written objection describes this document as one supplied in approximately 2010, but the document is dated July 21, 2015.

The expert witness testified he had been in the wireless industry for over 28 years and had been trained by virtually every major carrier: Cricket, AT&T, Contel, GTE Mobile Net, Sprint, Nextel, Boost, Metro PCS, Verizon, T-Mobile, Mountain Cellular, Golden State Cellular, "just to name a few." He identified call detail records related to [Frazer]'s phone number.[11] The records covered the period from 9/2/2009 through 12/5/2009. The expert testified he received copies of the records in 2010 from the Livingston Police Department. A copy of the application for the records by the U.S. Attorney's Office, and the order signed by a U.S. Magistrate, dated February 8, 2010, was received into evidence for the purpose of the hearing. In May 2015, AT&T purchased Cricket. From then forward all Cricket custodian of records requests were directed to AT&T.

The expert witness testified that in preparation for trial in 2015, the prosecution had served a subpoena on AT & T. In response, they received a letter saying the records were only maintained for six months and thus had been purged from Cricket's system. The expert testified that, because the records had been purged, the prosecution sent another subpoena to AT & T for certification with the copies of the records it possessed (from the 2010 search warrant) attached. He testified it is a common practice for people who have received the records to send them back to the carrier for authentication and the appropriate documentation.

The prosecution received a response to the subpoena dated June 23, 2015, with an affidavit and the records attached. The affidavit read: "My name is [J.N.]. I am over the age of 18 and qualified to make this affidavit. I am employed by AT & T as a Legal Compliance Analyst and also serve as the Custodian of Records for AT & T/Cricket. I have been employed by AT & T since October 9, 2006. Attached to this Affidavit are true and correct copies of subscriber information and call detail issued by AT & T/Cricket for the following accounts: [¶] [[Frazer]'s phone number] [¶] The attached copies of billing records are maintained by AT & T/Cricket in the ordinary course of business. I maintain and routinely rely on these documents in the course of my duties as Custodian of Records and Legal Compliance Analyst."

The expert opened the disc provided by AT & T and identified the call detail records related to [Frazer]'s phone number for the period of 9/2/2009 at 8:32:04 through 12/5/2009 at 22:37:19. The expert testified this was consistent with the hard copy he had received back in 2010.

The expert testified he was not personally present at the facility when the records were generated, but he was very familiar with Cricket at the time the records were generated. He testified that the time at which the particular entries were produced is reflected by specific dates and times within the call detail records.

The expert testified he knew the records attached to the affidavit were accurate because he compared the attached records to the copies he had in his files from 2010, and they were the same. The other reason he knew they were accurate was because he had reviewed "hundreds of thousands" of Cricket records, and the format, cell site list, acronyms and characters used, and accompanying documents of how to read the records were all consistent with the Cricket records he had reviewed. Cricket had formatting distinctive from other cellular companies. The cell site information was unique in that they used an alpha character and then a numeric value after that character to depict the market place and the related sector

---

[11] [Frazer]'s name was reflected in the carrier subscriber information in the document. During trial, [Frazer] admitted the phone number the records corresponded to was his.

of a specific cell site. The actual cell site number itself was encoded as well. Cricket also had specialized coding. The expert gave an example that a data connection would be referenced on a call detail record by pound 777 and if someone accessed their voicemail, it would be 99. The expert testified there are also other unique characters and special features unique to Cricket depicted in their records.

After hearing the testimony and some argument, the court stated that it seemed J.N.'s affidavit complied with Evidence Code sections 1271, 1560, 1561, and 1562 and thus the burden had shifted to the defense to refute the information in the affidavit. The court indicated the defense's position seemed to be based on prior affidavits by others stating the records had been purged. The court noted the newest affidavit was signed by someone in a different position in that she is a legal compliance analyst and a custodian of the records. The court held there was ample evidence the records were reliable. [Frazer]'s advisory counsel continued to clarify the objection:

> "[ADVISORY COUNSEL]: ... Part of the primary point is, there is no evidence that the 2010 documents were certified. So essentially what has happened, fast forward 2015, AT & T ... is certifying documents that weren't in their possession and certified documents that there has never been in evidence that they've been certified, and that's putting the cart before the horse.... If there is fault with part one of analysis, the proper authentication at the very beginning you then can't cure it by giving uncertified documents to a non-creator of the documents to simply certify these are the records. It's clear that the People gave them these uncertified documents so how can we now certify them? [¶] ... [¶]

> "THE COURT: I'm accepting your version as what happened.... But what changes is that because Cricket had this distinctive format that is a legal analyst and if the affidavits are presumed correct, there is a basis for her to authenticate based on the Cricket formatting that was distinctive and that would appear in the records that were sent to her. [T]hat's the basis for the Court's ruling."

The court overruled the objection to the admission of the cell phone records.

The expert witness testified before the jury at length regarding how cell phones work. He testified cellular phones are transceivers that pickup signals from their carriers' antennas or "cell sites." A computer sends out a signal looking for all customers in its network. When someone makes a call, the computer determines what cell site is closest to the caller. When one is traveling away from the cell site to which it was originally connected, the computer switches the phone to a closer cell site to avoid the call being dropped. When a call, text, or data is placed or received, it creates a "fingerprint" on the carrier's network, and then goes to the customer's bill, which shows the date and number of the call. This is all done by a "big computer."

The expert explained the records to the jury and showed that on November 6, 2009, at approximately 9:59 a.m., [Frazer]'s phone was connected to the sector of the cell site which covered the vicinity of the crime scene. The expert explained that according to the cell site data, [Frazer]'s phone appeared to be traveling south based on the cell site switches that occurred.

Frazer, 2019 WL 396856, at *12–14 (footnotes in original).

**b.  Analysis**

Petitioner asserts that the affidavit authenticating Petitioner's cell phone records was false, specifically the statement that "[t]he attached copies of billing records are maintained by AT&T/Cricket in the ordinary course of business" given that "AT&T was only in possession of the records at the time J.N. certified them as authentic because the prosecutor had provided them." (ECF No. 16 at 8 (quoting 7 CT 1784; <u>Frazer</u>, 2019 WL 396856, at *16)).

The Court need not decide whether J.N.'s affidavit "was sufficiently misleading to satisfy the first <u>Napue</u> prong, because to satisfy its second prong [Petitioner] would in any event still have to show that the state *knowingly* created a false impression." <u>Towery</u>, 641 F.3d at 309. In the instant case, the prosecution did not knowingly create a false impression. Rather, the prosecution was transparent with respect to the origins of the cell phone records and the manner in which AT&T provided its affidavit of authentication. It is clear from the state court record that the trial court was aware that Petitioner's cell phone records were initially obtained in 2010 from Cricket, the prosecution supplied a copy of said records to AT&T in order for AT&T to authenticate and supply the appropriate certification, and AT&T itself did not generate Petitioner's cell phone records. (2 RT 232–36, 336–60).

Based on the foregoing, Petitioner is not entitled to habeas relief on the ground that the prosecution knowingly presented a false affidavit regarding Petitioner's cell phone records.

**C.  Equal Protection**

In his second claim for relief, Petitioner asserts that the prosecution violated equal protection by presenting a false affidavit to circumvent evidentiary rules regarding cell phone records. Petitioner contends that in similarly situated cases, this was not done. (ECF No. 1 at 4).

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." <u>City of Cleburne v. Cleburne Living Ctr.</u>, 473 U.S. 432, 439 (1985) (citing <u>Plyler v. Doe</u>, 457 U.S. 202, 216 (1982)). Courts "have recognized successful equal protection claims brought by a 'class of one,' where the plaintiff alleges that she has been intentionally treated differently from others

1   similarly situated and that there is no rational basis for the difference in treatment." <u>Vill. of</u>

2   <u>Willowbrook v. Olech</u>, 528 U.S. 562, 564 (2000) (citing <u>Sioux City Bridge Co. v. Dakota</u>

3   <u>County</u>, 260 U.S. 441 (1923); <u>Allegheny Pittsburgh Coal Co. v. Commission of Webster Cty.</u>,

4   488 U.S. 336 (1989)).

5          As set forth in section IV(B)(3)(b), *supra*, Petitioner has not demonstrated that

6   prosecution knowingly presented a false affidavit regarding Petitioner's cell phone records; in

7   fact, the record clearly establishes that the prosecution was transparent with respect to the origins

8   of the cell phone records and the manner in which AT&T provided its affidavit of authentication.

9   Consequently, Petitioner is not entitled to habeas relief on the basis that the prosecution violated

10  the Equal Protection Clause by presenting a false affidavit to circumvent evidentiary rules

11  regarding cell phone records. Petitioner's second claim for relief should be denied.

12      **D. Speedy Trial**

13         In his third claim for relief, Petitioner asserts that his right to a speedy trial under the Due

14  Process Clause and the Sixth Amendment was violated when the prosecution waited until

15  February 11, 2011 to charge him for the robbery even though Petitioner was a suspect by January

16  6, 2010. (ECF No. 1 at 5, 31).

17         A speedy trial is a fundamental right guaranteed by the Sixth Amendment and imposed

18  upon the states by the Due Process Clause of the Fourteenth Amendment. <u>Klopfer v. North</u>

19  <u>Carolina</u>, 386 U.S. 213, 223 (1967). "On its face, the protection of the [Sixth] Amendment is

20  activated only when a criminal prosecution has begun and extends only to those persons who

21  have been 'accused' in the course of that prosecution." <u>United States v. Marion</u>, 404 U.S. 307,

22  313 (1971). Therefore, "it is either a formal indictment or information or else the actual restraints

23  imposed by arrest and holding to answer a criminal charge that engage the particular protections

24  of the speedy trial provision of the Sixth Amendment." <u>Id.</u> Here, as Petitioner is challenging a

25  pre-charging delay, the Sixth Amendment is not applicable and he is not entitled to habeas relief

26  on this ground.

27         However, the Supreme Court has recognized that "[i]n the first stage [of a criminal

28  prosecution]—before arrest or indictment . . . the Due Process Clause [acts] as a safeguard

against fundamentally unfair prosecutorial conduct," <u>Betterman v. Montana</u>, 136 S. Ct. 1609, 1613 (2016), and "has a limited role to play in protecting against oppressive delay," <u>United States v. Lovasco</u>, 431 U.S. 783, 789 (1977). The Due Process Clause maybe violated if the "delay undertaken by the Government [is] solely 'to gain tactical advantage over the accused'" or "reckless," but "to prosecute a defendant following investigative delay does not deprive him of due process, even if his defense might have been somewhat prejudiced by the lapse of time." <u>Lovasco</u>, 431 U.S. at 795 & n.17, 796 (quoting <u>Marion</u>, 404 U.S. at 324).

In order to succeed on a due process claim for pre-charging delay, a petitioner "must satisfy both prongs of a two-part test. First, he must prove 'actual, non-speculative prejudice from the delay.'" <u>United States v. Corona-Verbera</u>, 509 F.3d 1105, 1112 (9th Cir. 2007) (quoting <u>United States v. Huntley</u>, 976 F.2d 1287 1290 (9th Cir. 1992)). "Second, the length of the delay is weighed against the reasons for the delay, and [the petitioner] must show that the delay 'offends those fundamental conceptions of justice which lie at the base of our civil and political institutions.'" <u>Corona-Verbera</u>, 509 F.3d at 1112 (internal quotation marks omitted) (quoting <u>United States v. Sherlock</u>, 962 F.2d 1349, 1353–54 (9th Cir. 1989)).

"[E]stablishing prejudice is a 'heavy burden' that is rarely met," and "[g]eneralized assertions of the loss of memory, witnesses, or evidence are insufficient to establish actual prejudice." <u>Corona-Verbera</u>, 509 F.3d at 1112 (first quoting <u>Huntley</u>, 976 F.2d at 1290; then quoting <u>United States v. Manning</u>, 56 F.3d 1188, 1194 (9th Cir. 1995)). Thus, the petitioner "must show both that lost testimony, witnesses, or evidence 'meaningfully has impaired his ability to defend himself,' and '[t]he proof must demonstrate by definite and non-speculative evidence how the loss of a witness or evidence is prejudicial to [his] case.'" <u>Corona-Verbera</u>, 509 F.3d at 1112 (alterations in original) (quoting <u>Huntley</u>, 976 F.2d at 1290).

Here, Petitioner does not meet his burden of establishing prejudice. Petitioner claims that he was prejudiced because AT&T/Cricket no longer possessed copies of his cell phone records.[12] (ECF No. 1 at 20). However, Petitioner does not demonstrate how AT&T's lack of possession of

---

[12] The Court notes, however, that the prosecution possessed a copy of the cell phone records from Cricket pursuant to a 2010 search warrant. <u>See</u> section IV(B)(3), *supra*.

Petitioner's cell phone records was prejudicial to his defense. Accordingly, Petitioner is not entitled to habeas relief on this ground.

**E. Confrontation Clause**

The Sixth Amendment's Confrontation Clause, made applicable to the states by the Fourteenth Amendment, Pointer v. Texas, 380 U.S. 400, 403 (1965), provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him," U.S. Const. amend. VI. The Supreme Court has "limited the Confrontation Clause's reach to testimonial statements." Michigan v. Bryant, 562 U.S. 344, 354 (2011). "Business and public records are generally admissible absent confrontation not because they qualify under an exception to the hearsay rules, but because—having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial—they are not testimonial." Melendez-Diaz v. Massachusetts, 557 U.S. 305, 324 (2009).

The Ninth Circuit has held that "a routine certification by the custodian of a domestic public record . . . and a routine attestation to authority and signature . . . are not testimonial in nature." United States v. Weiland, 420 F.3d 1062, 1077 (9th Cir. 2005). See Melendez-Diaz, 557 U.S. at 322–23 (noting that "a clerk's  certificate authenticating an official record—or a copy thereof—for use as evidence," "though prepared for use at trial, was traditionally admissible"); United States v. Gal, 606 F. App'x 868, 875 (9th Cir. 2015) (holding that no Confrontation Clause "violation occurred because an affidavit offered only to authenticate a record is not testimonial"); United States v. Anekwu, 695 F.3d 967, 971 (9th Cir. 2012) (holding that the district court did not commit plain error by admitting certificates of authentication for foreign public and business records).

Here, the document challenged by Petitioner is an affidavit authenticating Petitioner's cell phone records. Based on the cases set forth above, Petitioner has not established a violation of the Confrontation Clause, and he is not entitled to habeas relief on this ground.

///

///

///

**V.**

**RECOMMENDATION**

Based on the foregoing, the undersigned HEREBY RECOMMENDS that the petition for writ of habeas corpus be DENIED.

This Findings and Recommendation is submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within **THIRTY (30) days** after service of the Findings and Recommendation, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the objections shall be served and filed within fourteen (14) days after service of the objections. The assigned District Judge will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **April 21, 2021**

UNITED STATES MAGISTRATE JUDGE